EXHIBIT "A"

CARMICHAEL & POWELL
PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
7301 NORTH 16TH STREET, SUITE 103
PHOENIX, ARIZONA 85020-5297
(602) 861-0777

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

- 6 -

## OPERATING AGREEMENT
## OF
## ST. MICHAEL'S CENTER FOR SPECIAL SURGERY – ARIZONA, L.L.C.

As of the effective time of the Articles of Organization of St. Michael's Center for Special Surgery – Arizona, L.L.C., an Arizona limited liability company, the Manager and Members enter into this Agreement for the purpose of setting forth the agreements between themselves and the Company and with one another. The terms of the Agreement are as follows:

## ARTICLE I

## ORGANIZATIONAL MATTERS

**SECTION 1.01.** Formation. The Company is formed as a limited liability company pursuant to the provisions of the Act (as hereinafter defined) and any successor to such Act. The rights and obligations of the Members, and the affairs of the Company, shall be governed first by the Mandatory Provisions of the Act, second by the Company's Articles of Organization, and third by this Agreement. In the event of any conflict among the foregoing, the conflict shall be resolved in the order of priority set forth in the preceding sentence.

**SECTION 1.02.** Name. The name of the Company is " St. Michael's Center for Special Surgery – Arizona, L.L.C."

**SECTION 1.03.** Principal Office. The principal office of the Company in the State of Arizona shall be located at 14362 North Frank Lloyd Wright Boulevard, Suite 2125, Scottsdale, Arizona 85260. The name of its registered agent is Barrett Huffmyer. The Company may also maintain offices at such other place or places as the Members deem advisable.

**SECTION 1.04.** Term. The Company began upon filing of the Company's Articles of Organization with the Secretary of State, and shall continue perpetually unless sooner terminated as provided in this Agreement.

## ARTICLE II

## DEFINITIONS

**SECTION 2.01.** Definitions. For purposes of this Agreement the following terms shall have the meanings ascribed to them.

1. "Act" means the Arizona Limited Liability Company Act as it may be amended from time to time, and any successor to such act.

2. "Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. As used in this definition of "Affiliate", the term "control" means either (i) the possession, directly or indirectly, of the power to direct or cause the direction of

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 2 of 37

the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, or (ii) a direct or indirect equity interest of ten percent (10%) or more in the entity.

3.    "Agreement" means this Operating Agreement, as it may be amended or supplemented from time to time.

4.    "Articles" or "Articles of Organization" means the articles of organization, as amended from time to time, filed by the Company under the Act.

5.    "Assignee" means a Person to whom one or more Units have been transferred, by transfer or assignment or otherwise, in a manner permitted under this Agreement, and who has agreed to be bound by the terms of this Agreement but who has not become a Substitute Member.

6.    "Board of Executive Members" means the Board of Members (hereinafter referred to as "Board") established pursuant to Section 8.01.

7.    "Bankruptcy" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person (i) the inability of such Person generally to pay its debts as such debts become due, or an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (ii) the filing of any petition or answer by such Person seeking to adjudicate itself as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its Property; or (iii) corporate action taken by such Person to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver or liquidator of such Person or of all or any substantial part of the Property of such Person which order shall not be dismissed within ninety (90) days.

8.    "Business Day" means Monday through Friday of each week, except legal holidays recognized as such by the Government of the United States.

9.    "Capital Account" means each capital account maintained for a Member pursuant to Section 4.03.

2

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 3 of 37

10. "Capital Contributions" means the sum of the values of cash, property, services rendered, or a promissory note or other binding obligation to contribute cash or property or to perform services contributed to the Company by all Members, or any one Member, as the case may be (or the predecessor holders of any such Members). Each contribution in a form other than cash must be expressly permitted by the Board of Executive Members and the value of such capital contribution shall be established by the Board of Executive Members in its sole discretion at the time of contribution.

11. "Capital Gain" means the Company's allocable share of gain from the disposition by the Company of a capital asset as defined in the Code (including any portion of such gain treated as ordinary Income).

12. "Cash Available for Distribution" means, with respect to any period, all cash receipts and funds received by the Company (except for Capital Contributions) minus (i) all cash expenditures and (ii) the cash reserved for working capital or purposes other than distributions. A cash reserve may be maintained by the Manager subject to Board approval.

13. "Center" means an ambulatory surgery center commonly known as St. Michael's Center for Special Surgery-Arizona, L.L.C.

14. "Code" means the Internal Revenue Code of 1986, as amended, as in effect from time to time.

15. "Company" means the limited liability company identified in Section 1.02.

16. "Company Property" means all property owned, leased or acquired by the Company from time to time.

17. "Confidential Information" means any and all policies, procedures, contracts, quality assurance techniques, managed care initiatives, utilization management, patient records, credentialing, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information. Confidential Information does not include information which: (i) was lawfully made available to or known by third persons on a non-confidential basis prior to disclosure by a Member; (ii) is or becomes publicly known through no wrongful act of a Member; or (iii) is received by a Member from a third party other than in breach of confidence.

18. "Disqualified Member" has the meaning specified in Section 13.01.

19. "Equipment Lease" means the Lease of furniture and medical equipment for the Center.

3

578540.4/BPH/16198/0101/051707

20.    "Fair Market Value" means the amount the purchaser would pay to the seller, neither being under a compulsion to buy or sell, of the equity value of the Company Property, a Unit, or the Manager interest of the Manager, as the case may be, on a going concern basis of the Company and the Center as an independent enterprise, as determined by an Appraisal, taking into account each Member's share of the Loans. Fair Market Value cannot consider the volume or value of referrals from the purchaser or the seller.

21.    "Good faith" means reasonable and prudent action, taken in light of the facts known to the actor after the exercise of due diligence.

22.    "Income" and "Loss" mean an amount equal to the Company's taxable income or loss (excluding Capital Gain or Loss) for each taxable year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

a.    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Income or Loss shall be added to such Income or Loss.

b.    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing, Income or Loss, shall be subtracted from such Income or Loss.

c.    Upon the distribution of property by the Company to a Member, gain or loss attributable to the difference between the fair market value of the property and its basis shall be treated as recognized.

23.    "Leases" means the Property Lease and the Equipment Lease.

24.    "Loans" means the Working Capital Note and the Tenant Improvement Note.

25.    "Majority Votes" with respect to Member votes means the affirmative vote of the majority of the Outstanding Units held by the Members, which vote may be recorded in the minutes of a meeting of the Members or in a written consent in lieu of a meeting. In all matters submitted to a vote of the Members, each Member shall be entitled to one (1) vote for each Outstanding Unit held by such Member. "Majority Vote" with respect to Board of Executive Members shall mean the affirmative vote of a majority of the Members elected to the "Board of Executive Members".

26.    "Manager" means initially Provision Surgical, L.L.C., hereinafter referred to as "PVS" and any subsequent Manager or Managers appointed by the Members.

27.    "Mandatory Provisions of the Act" means those provisions of the Act which may not be waived by the Members acting unanimously or otherwise.

4

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 5 of 37

28. "Member" means those individuals, partnerships, corporations, limited liability companies, or other legal entities executing this Agreement (as Members of the Company on the signature pages hereto) and any Substitute Members.

29. "Net Monthly Collected Revenues" means cash receipts or collections during each month on patient billing accounts, net of refunds, as determined in accordance with generally accepted accounting principles.

30. "Outstanding Units" means the number of Units issued by the Company as shown on the Company's books and records, less any Units held by the Company.

31. "Person" means a natural person, partnership, domestic or foreign Membership, domestic or foreign limited liability company, trust, estate, association or corporation.

32. "Prime Rate" means the prime rate (or base rate) reported in the "Money Rates" column or section of The Wall Street Journal as being the base rate on corporate loans at larger U.S. Money Center banks on the first date on which The Wall Street Journal is published in each month. In the event The Wall Street Journal ceases publication of the Prime Rate, then the "Prime Rate" shall mean the "prime rate" or "base rate" announced by the bank with which the Company has its principal banking relationship (whether or not such rate has actually been charged by that bank). In the event that bank discontinues the practice of announcing that rate, Prime Rate shall mean the highest rate charged by that bank on short-term, unsecured loans to its most credit-worthy large corporate borrowers.

33. "Procedures" means those procedures on the list of Medicare covered procedures for ambulatory surgery centers in accordance with regulations issued by the United States Department of Health and Human Services. A "Proceduralist" is any physician performing a substantial number of such Procedures as part of his or her medical practice.

34. "Property Lease" means the Lease of the property and improvements for the Center facility.

35. "Record Holder" means the Person in whose name such Units are registered on the books and records of the Company as of the close of business on a particular Business Day.

36. "Substitute Member" means a transferee of a Unit who is admitted as a Member to the Company pursuant to Section 11.01 in place of and with all the rights of a Member.

37. "Tax Item" means each item of income, gain, loss, deduction, or credit of the Company for federal tax purposes, as separately stated and calculated pursuant to the Code.

38. "Tax Matters Member" means the Manager (initially "PVS").

39. "Tenant Improvement Note" means sums borrowed by the Company for Tenant improvements to be made in the Leased space to be occupied by the Center.

5

40.    "Unit" means a Unit representing an interest in the Company. Each Unit is equal to every other Unit, and is entitled to one (1) vote on all matters submitted to a vote of the Members. Unit shall also refer to any fractional Units held by the Members which shall have a corresponding fractional vote.

41.    "Working Capital Note" means sums borrowed by the Company for Working Capital.

## ARTICLE III

### PURPOSE

**SECTION 3.01.**    ·Purpose of the Company. The purpose of the Company shall be as stated in the Articles of Organization.

**SECTION 3.02.**    Primary Purpose. The primary purpose of the Company is to provide ambulatory surgery services and services that are ancillary and related thereto  Such services will promote greater efficiency in the provision of ambulatory surgery services. The Company may also pursue any other lawful activity that is approved by the Board of Executive Members. No health services other than ambulatory surgical services may be provided at the Center without the Board's consent.

## ARTICLE IV

### CAPITAL CONTRIBUTIONS

**SECTION 4.01.**    Initial Capital Contributions. Each Member shall make an initial non-refundable capital contribution to the Company in the amount set forth on Schedule A.

**SECTION 4.02.**    Additional Capital Contributions. If, in the discretion of the Board, additional capital is needed by the Company for operating expenses, debt service or other Company obligations or to protect and preserve the value of the Company or the Company Property, the Board may, at any time and from time to time, call for additional Capital Contributions from all Members in proportion to their respective Units. Each Member shall contribute his respective additional Capital Contribution(s) within thirty (30) days of notice of such capital call by the Board.

**SECTION 4.03.**    Remedies for Default. If any Member fails to pay any amount that he is required to pay to the Company as an additional Capital Contribution under Section 4.02, he shall be deemed a Defaulting Member.

**SECTION 4.04.**    Capital Accounts.

1.    The Company shall maintain for each Member a separate Capital Account. The term "Capital Account" shall mean as to any Member and as to any Units held by that Member the amount of the initial Capital Contribution attributable to the Units held by that Member, which amount shall

6

be (i) increased by subsequent Capital Contributions by such Member, and Capital Gain and Income allocated to such Member pursuant to Section 5.02, and (ii) decreased by distributions to such Member pursuant to Section 5.01 and Losses allocated to such Member pursuant to Section 5.02.

2.    Property or services contributed by a Member shall be credited to such Member's Capital Account at the fair market value of such property or services at the time of contribution as determined by the Board of Executive Members in its sole discretion.

3.    The foregoing definition of Capital Account and certain other provisions of this Agreement are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with that regulation. Such regulation contains additional rules governing maintenance of capital accounts which are incorporated by reference into this Agreement.

4.    An Assignee of a Unit will succeed to the Capital Account relating to the Unit transferred. However, if the transfer causes a termination of the Company under Section 708(b)(1)(B) of the Code, the Company Property shall be deemed to have been distributed in liquidation of the Company to the Members (including the transferee of a Unit) pursuant to Section 13.02 and recontributed by such Members and transferees in reconstitution of the Company. The Capital Accounts of such reconstituted Company shall be maintained in accordance with the principles of this Section 4.04.

5.    At such times as may be permitted or required by Treasury Regulations issued pursuant to Section 704 of the Code, the Capital Accounts shall be revalued and adjusted to reflect the then fair market value of Company Property and the Capital Accounts shall be maintained to comply with the Treasury Regulations Section 1.704-1(b)(2)(iv)(f). All allocations of gain resulting from such revaluation shall be made consistently with that regulation; and to the extent not inconsistent therewith, the Income allocation provisions of Section 5.02 hereof.

**SECTION 4.05.**    Interest. No interest shall be paid by the Company on Capital Contributions, on balances in a Member's Capital Account or on any other funds distributed or distributable under this Agreement.

**SECTION 4.06.**    Withdrawal. Except as otherwise required under any Mandatory Provisions of the Act or as otherwise provided in this Agreement, no Member shall have (i) any right to resign voluntarily or otherwise to withdraw from the Company, or (ii) any right to the withdrawal or reduction of any part of his Capital Contribution, without the consent of all remaining Members of the Company.

**SECTION 4.07.**    Loans. Loans by a Member to the Company shall not be considered Capital Contributions.

**SECTION 4.08.**    No Return of Contributions. A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its capital account or its Capital Contributions. An unpaid Capital Contribution is not a liability of the Company or of any

7

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 8 of 37

Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

**SECTION 4.09.** Advances by Members. Any member may make or cause a loan to be made to the Company. If a Member lends money to the Company, said Member shall be entitled to repayment of said loan in full, together with interest at the Prime Rate plus one (1) percentage point, before there are any distributions to the Members. Until said loan is repaid in full, said loan shall be secured by a security interest in all of the assets and accounts receivable of the Company.

**SECTION 4.10.** Loan Guarantees. The Members may be required to personally guarantee (proportionate to each Member's percentage interest as per Schedule A) the indebtedness of the Company arising under loan agreements, leases or other arrangements. Such guarantees may include indebtedness arising after execution of the guaranty. Upon approval of a requirement for such guarantees by a Majority Vote of the Members, then each Member agrees unconditionally to provide, duly execute and deliver such loan guarantees as are required of him or her to advance the business interest of the Company. The Member who fails to provide a loan guarantee when required by the Company pursuant to this Section shall be deemed to be a Defaulting Member.

## ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

**SECTION 5.01.** Distribution of Cash Available for Distribution. Distributions of all Cash Available for Distribution and any property distributions shall be made not less frequently than quarterly. Any distribution in respect of property shall be allocated to the Member who originally contributed the property to the Company. Any distribution of cash shall be allocated to the Members in the same proportion as the number of Units held by each Member bears to all Outstanding Units.

**SECTION 5.02.** Allocation of Income and Loss.

1. Except as provided in Section 5.02(2) herein, all Tax Items shall be allocated to all Members and Assignees in accordance with the weighted average number of Units held by a Member or Assignee during the period of allocation. Any distribution in respect of stock or other non-cash assets shall be allocated directly to that Member's Capital Account who contributed the stock or other non-cash asset to the Company.

2. Notwithstanding anything to the contrary in this Section 5.02, if there is a net decrease in "minimum gain" (within the meaning of Treasury Regulations Section 1.704-1(b)(4)(iv)(c) during a fiscal year, all Members with a deficit balance in their Capital Accounts at the end of that year (excluding items described in Treasury Regulations Section 1.704-1(b)(4)(iv)(e)) shall be allocated, before any other allocations of Company items for such fiscal year, items of Income and gain for such year (and if necessary, subsequent years), in an amount and in the proportions necessary to eliminate such deficits as quickly as possible. The foregoing sentence is intended to be a "minimum gain charge back" provision as described in Treasury Regulations Section 1.704-1(b)(4)(iv)(e), and shall be interpreted and applied in all respects in accordance with that regulation.

8

578540.4/SPH/16198/0101/051707

3.    If during any fiscal year of the Company, any Member unexpectedly receives an adjustment, allocation, or distribution of the type described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), that Member shall be allocated items of Income in an amount and manner sufficient to eliminate that Member's deficit Capital Account balance as quickly as possible.

4.    Under regulations prescribed by the Secretary of the Treasury pursuant to Section 704(c) of the Code, items of Capital Gain, Income and Loss with respect to property contributed to the Company by a Member shall be shared among Members as set forth in Section 5.02(2) and so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution. Any items allocated under this Section 5.02.(4) shall not be debited or credited to the Capital Accounts to the extent that item is already taken into account (upon formation or otherwise) in determining a Member's Capital Account.

5.    Upon the transfer of a Unit, Income, Capital Gain and Loss attributable to the transferred Unit shall, for federal income tax purposes, be allocated to the owners of such Unit on the basis of the Income or Loss for each month that such Person was the owner of such Units, determined on a monthly interim closing of the books using the accrual basis method of accounting. The Members may revise, alter, or otherwise modify the method of allocations as they determine necessary to comply with Section 706 of the Code and regulations or rulings promulgated thereunder.

6.    If, and to the extent that, any Member is deemed to recognize Income as a result of any transaction between the Member and the Company pursuant to Sections 482, 483, 1272-1274, or 7872 of the Code, or any similar provision now or hereafter in effect, any corresponding resulting Loss or deduction of the Company shall be allocated to the Member who was charged with that Income.

7.    All tax credits for federal or state income tax purposes shall be allocated in the same manner as Income.

## ARTICLE VI

## MANAGEMENT AND OPERATION OF BUSINESS

**SECTION 6.01.**    Management by Manager.

1.    The business of the Company shall be managed by a Manager or Managers appointed by the Members pursuant to this Agreement. The initial Manager shall be PVS. The Manager shall be responsible for the management of the Company pursuant to this Agreement, including the day-to-day operations of the Center. Except as otherwise limited herein, the Manager shall (i) exercise complete and exclusive control of the management of the Company's business and affairs and (ii) have the right, power and authority on behalf of the Company, and in its name, to exercise all of the rights, powers and authorities of the Company under the Act, except as otherwise expressly limited in this Agreement. If all Managers have resigned or have been removed from office, the business of the Company shall be managed by the Members until they appoint a successor Manager.

9

578540.4/SPH/1619B/0101/051707

2. The Manager's act shall bind the Company unless the person relying on the act had actual knowledge that the act was unauthorized. A third person may rely in good faith on the act, deed, and/or signature of the Manager to act on behalf of the Company. Unless otherwise provided in this Agreement, action requiring a vote of the Members may be approved by the Majority Vote of the Members. In addition, action requiring the affirmative vote of the Board of Executive Members may be approved by Majority Vote of the Board of Executive Members.

3. Each Member irrevocably constitutes and appoints, with full power of Substitution, the Manager as its true and lawful attorneys-in-fact with full power and authority in its name, place and stead to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including but not limited to:

        a. All certificates and other instruments (including counterparts of this Agreement), and any amendment thereof, which the Manager deems appropriate to form, qualify or continue the Company as a limited liability company;

        b. Any other instrument or document which may be required to be filed by the Company under the laws of any state or which the Managers deem advisable to file;

4. The appointment by the Members of the Manager as their attorneys-in-fact is irrevocable and shall be deemed to be a power coupled with an interest and shall survive the Bankruptcy of any person giving such power and the transfer or assignment of all or any part of the Membership Interest of such person; provided, however, that in the event of the transfer by a Member of all or any part of such Member's Membership Interest, this power of attorney of a transferor Member shall survive such transfer only until such time, if any, as the transferee shall have been admitted to the Company as a substituted Member and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

**SECTION 6.02.** Company Funds. The Manager shall deposit the funds of the Company in an account or accounts designated by the Manager. The funds of the Company shall not be commingled with any other funds. All withdrawals from or charges against these accounts shall be made by authorized officers or agents of the Company.

**SECTION 6.03.** Management Fee. The Manager shall receive a management fee equal to four percent (4%) of the "net monthly collected revenues" or a minimum of $10,000.00 whichever is greater, from the Center's cash collections payable on the first (1st) of each month (the "Management Fee"). If the cash flow of the Company is insufficient to pay such Management Fee the unpaid portion of such Management Fee may, at the option of the Manager, be deferred and bear interest at the prime rate plus one percent (1%). Under no circumstances shall the Management Fee exceed Twenty Thousand Dollars ($20,000.00) in any given month.

**SECTION 6.04.** Billing and Collection Fee. Surgeons's Management, Inc., a Texas corporation ("SMI") shall receive a billing and collection fee equal to four percent (4%) of the "net

10

578540.4/SPH/16198/0101/051707

monthly collected revenues" or a minimum of $10,000.00 whichever is greater, from the Center's cash collections payable on the first (1ˢᵗ) of each month (the "Billing and Collection Fee"). If the cash flow of the Company is insufficient to pay such Billing and Collection Fee the unpaid portion of such Billing and Collection Fee may, at the option of the Manager, be deferred and bear interest at the prime rate plus one percent (1%). Under no circumstances shall the Billing and Collection Fee exceed Twenty Thousand Dollars ($20,000.00) in any given month.

**SECTION 6.05.** Organizational and Clinical Development Fee. Upon execution of this Agreement, the Company shall pay the Manager a fee equal to $250,000.00 for the costs and services incurred in connection with organization the clinical development of the Company including but not limited to obtaining equipment, supplies and professional services, employee training, setting up the books and records, preparing and distributing procedure manuals, and establishing facility certification (the "Organizational and Clinical Development Fee"). Such fee shall be due and payable upon the signing of this agreement.

**SECTION 6.06.** PVS as Member. PVS shall make an initial contribution in return for Units representing twenty percent (20%) of the Company as set forth on Schedule A. PVS shall make such additional contributions, and shall receive such additional Units, as required from time to time to maintain its 20% interest in the Company. The parties intend that PVS shall have preemptive rights such that it may hold at least twenty percent (20%) of the Outstanding Units at any time.

**SECTION 6.07.** Organizational and Developmental Services.

1.  Services in General. Manager shall render all services, direction, advice, supervision and assistance necessary to make the Center fully operational. These services include, but are not limited to, acting as general agent on behalf of the Company within the scope of authority of this Agreement or such greater authority granted by the Board during the organization and development stage of the Center and those services specifically enumerated in this section.

2.  Architectural Plans and Building Designs. Manager shall provide the Board with basic site plan, floor plan, and elevations or basic remodeling plan, if applicable, for one ambulatory surgery center. Manager shall assist the Board in engaging qualified architects to develop such plans and shall deal directly with engineers and architects to assure that all construction and design meets Local, State, and Federal requirements, that the Center is completed in a timely manner and in accordance with the Board's specifications. After plans and specifications are complete and approved by the Board, Manager shall submit to the Board an estimated cost of construction for approval by the Board and upon receipt of such approval, then proceed with construction of the Center. Manager will work directly with the contractor who will perform site inspections and shall approve draws through the construction phase. Any draw which has been requested by the Contractor shall require the approval of Manager before payment can be made under such draw. The total construction cost of the Center shall be approved to by the Board. The expenses of the services of these related professionals shall be paid by the Company.

3.  Bankers, Vendors, and Third-Party Financing. Manager shall deal directly with bankers, vendors, and other third parties on behalf of the Company as necessary, to arrange any

11

579540.4/SPH/16198/0101/051707

financing for the Center, but may not commit to any financing without the consent of the Board. The Board has the exclusive right to procure all necessary financing for the Center. The expenses associated with application for or receipt of financing and purchased services and equipment shall be paid by the Company. Furthermore, Manager shall act as procurement agent in obtaining any and all equipment and supplies for the Center.

4.    Permits and Licenses. On the Company's behalf, Manager shall apply for and maintain in full force and effect all necessary licenses and permits required for operation of the Center. All such licenses and permits shall be issued in the name of the Company. The expenses for any permits and licenses shall be paid for by the Company.

5.    Other Services. Manager may retain legal counsel and other professional services on behalf of the Company as necessary for the proper organization and management of the Company. Any expenses related to such services shall be paid by the Company.

**SECTION 6.08.**    Management Services. Subject to the authority reserved to the Members and the Board, Manager shall render all services, direction, advice, supervision and assistance in the operation of the Center as necessary including, but not limited to:

1.    General. Manager shall provide all accounting and related financial support services required in connection with the operation of the Center including, without limitation, financial record keeping, accounts receivable and accounts payable processing to the extent that such services are required for ancillary to or directly related to, the provision of surgical services at the Center. Manager shall render such financial management, consultation and advice as may be reasonably required in connection with the operation of the Center. Manager shall further perform all acts necessary for the efficient delivery of quality surgical services (including, but limited to x-ray and CR) at the Center, including without limitation those duties set forth below.

a.    Personnel. Manager shall develop compensation profiles and job descriptions for all managerial, administrative, clerical and non-physician clinical staff of the Center (collectively the "Center Personnel").

b.    Billing, Coding, and Collection. SMI shall bill, code and collect for all services, other than physician services, rendered at the Center. Manager shall not be responsible for this service except in a supervisory capacity.

c.    Purchasing. Manager shall purchase all supplies, inventory, pharmaceutical, and other items necessary for the efficient operation of the Center.

d.    Contractors. Manager shall engage such contract professionals and services providers, such as housekeeping services and hazardous waste disposal services, as needed to provide services not delivered by Manager.

e.    Credentialing. Manager shall credential applicants for initial membership or clinical privileges or renewal of membership/clinical privileges at the Center in accordance with

12

578540.4/SPH/16198/0101/051707

criteria and Policies and Procedures adopted by the Company.

    f.    Forms/Policies.  Manager shall develop such business forms and policies and procedures as are necessary or desirable for the operation of the Center, including without limitation, financial responsibility, consent for medical care and/or laboratory testing, employee relations policies.

    2.    Staffing.  Manager shall hire, train, promote, set salary, benefit levels, and supervise the work of all employees of the Center ("Center Personnel"). All of such employees including the Administrator shall be on the Company's payroll. The Company shall pay for the gross salaries, benefits, insurance, payroll taxes, etc. paid to the Employees on the Company payroll in the form of an Employee salary.

    3.    Compliance with Laws and Representation.  Manager shall arrange at Company's expense for compliance with all statutes, ordinances, laws, rules, regulations, orders, and determinations affecting or issued in connection with the Center and with prior written notification to the Board, make arrangements for any alterations or repairs ordered or required thereby. Manager may employ accountants, attorneys and other professional consultants to the extent reasonably necessary in Manager's judgment to protect the interest of the Company, the Manager and employees of the Center, in matters relating to the Center and including, without limitations, EEC claims, unemployment compensation claims, collection of past due accounts, determination of property taxes and procurement of insurance. The expense of said legal and other professional services shall be paid for by the Company.

    4.    Accounting.

        a.    Bookkeeping and Accounting Functions.  Manager shall establish and supervise all bookkeeping, accounting and clerical services, including the maintenance of payroll records, incident to the efficient operation and maintenance of the Center with associated costs to be reimbursed by the Company, at the direction of the Board. Company retains the right to audit any books or records kept for the Center by Manager. Manager agrees to keep such books and records accessible to the Company for a period of not less than ten (10) years.

        b.    Bookkeeping Department.  Manager shall establish and supervise a bookkeeping department with appropriate accounting and cost control systems and personnel to be maintained by PVS personnel or a third party, to be decided at the discretion of the Board. Charts of accounts and all accounting systems shall be maintained in accordance with generally accepted accounting principles. Manager shall cause the bookkeeping department to prepare and file all necessary reports of any relevant governmental agencies and authorities, as well as reports with respect to withholding taxes, social security taxes, unemployment insurance, disability insurance, the Fair Labor Standards Act, and all other statements and reports pertaining to labor employed in or about the Center.

        c.    Accounting Systems.  All accounting systems, procedures and manuals, excluding normal consumable supplies and related materials utilized by such accounting department,

13

578540.4/SPH/16198/0101/051707

shall be and remain the exclusive property of the Company. Upon dissolution of this Company or termination of Manager as Manager of the Company, Manager shall not be entitled to remove from the Center all such material.

      d.    <u>Annual Budget.</u> Each year within forty-five (45) days of the close of the fiscal year of the Company, the Manager shall submit to the Board for its review and approval a proposed budget for the succeeding year. Said budget shall set out in detail the proposed salaries and benefits for all employees, any proposed capital expenditures and any expenditure in excess of twenty-five thousand dollars ($25,000.00).

      5.    <u>Financial Statements.</u> On or before the 25th day of each calendar month, Manager shall render to the Company, and to any persons designated by the Company, a detailed balance sheet, statement of income and expense and statement of changes in financial position of the Center for the preceding calendar month and for the portion of the fiscal year ended on the last day of such preceding calendar month. Manager shall render to the Company, and to any persons designated by the Company, within sixty (60) days after the end of each fiscal year, a balance sheet of the Center as of the end of such year in accordance with generally accepted accounting principles which shall be audited by a certified public accountant chosen by the Board.

      6.    <u>No Liability.</u> Manager is authorized to and shall receive and disburse funds on behalf of the Company in connection with the ordinary business of the Center provided the Manager has received the prior written consent of the Board. The Company will be solely responsible for all costs and expenses of any kind associated with the Center, and Manager shall have no liability or obligation with respect thereto, except for unauthorized acts by Manager, as specified herein.

      7.    <u>Operational Policies.</u> Manager shall provide initial implementation of all standard systems, methods, procedures and controls for record keeping, financial, security, administrative, patient charting documentation, patient billing procedures, patient consent, insurance reimbursement, housekeeping, maintenance, personnel and safety requirements, and related ethical protocols. Any costs associated with necessary forms and supplies to carry out such procedures are the responsibility of the Company.

      8.    <u>Insurance.</u>

      a.    <u>Procurement of Insurance.</u> Manager shall maintain, at the Company's expense, insurance of such kinds and amounts as the Company shall require. The Company and Manager agree that such insurance shall be maintained with companies and through brokers offering the necessary coverage at the most reasonable costs, consistent with prudent judgment regarding the fiscal stability and business practices of the insurer. Manager shall furnish the kinds and amount of insurance required to be maintained pursuant to any note, loan agreement or mortgage, and such other kinds and amount of insurance as Manager shall deem necessary or advisable for the protection of Manager and the Company.

      b.    <u>Insureds.</u> All policies of liability insurance shall name the Company and such other parties as may be required by the provisions of any loan agreement, note or mortgage, as

14

insureds thereunder, as their respective interests may appear. Manager may elect to be named as an additional insured.

      c.     Workers Compensation Insurance. Manager shall obtain for the Company, if requested by the Board, workers' compensation insurance covering all liability of the Company under the worker's compensation laws of the State. Manager shall obtain and maintain at Company's expense workers compensation insurance covering its obligations respecting Manager's employees providing services at the Center.

9.     Bank Account and Flow of Funds. Manager shall establish and/or maintain bank accounts in the name of the Company ("Company's Bank Account") in a financial institution ("Institution") and shall deposit therein all receipts and monies arising from the operation of the Center or otherwise received by Manager on behalf of the Center. The Company shall have an additional account where all receivables shall be deposited and shall be managed by the Board.

10.     Payment of Operating Expenses.

      a.     Operating Account. Manager shall oversee the payment of the operating expenses of the Center, from the Company Bank Account, as such expenses are due and payable. Operating expenses shall include, without limitation, all expenses connected with the operation and maintenance of the facility as herein described and payment of expenses associated with the collection of Center accounts receivable. Operating expenses shall include any fees due to Manager hereunder. Operating expenses shall not include Manager expenses which are not directly related to the operation of the Center.

      b.     Deficits in Operating Accounts. In the event that the balance of the Company Bank Account is insufficient to pay operating expenses when due, the Company shall fund the deficit promptly following notice from Manager.

      c.     Records. Manager shall maintain complete and accurate records, consistent with the general practices of Manager, of all fees, charges and billings of all such services. The Board or Board's duly authorized agent shall have the right at all reasonable times and upon the giving of reasonable notice to examine, inspect and copy the records of Manager pertaining to such fees, charges, billings, costs and expenses.

11.     Fees and Charges. The Board shall establish, maintain, revise and administer the overall charge structure of the Center. The Board shall notify the Company in advance of any recommended major changes in fees or operational systems.

12.     Vendor's Contracts. Manager shall enter into contracts in the name of and at the expense of the Company to provide the Center with all electricity, gas, water, telephone, cleaning services, air conditioning maintenance, and other necessary utilities or services, and purchase all materials and supplies in the name of, for the account of, and at the expense of, the Company, within approved limitations.

15

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 16 of 37

12.    Repairs and Maintenance. In accordance with this Agreement, Manager shall arrange for the making or installing at Company's expense and in the name of the Company, at reasonably competitive costs, such alterations, repairs, decorations and/or replacements of any equipment deemed reasonable and necessary by the Manager. Manager shall not undertake significant remodeling or added services without consultation and approval of the Board.

13.    Tax Representation. Manager shall assist the Company and/or its representative in the filing of all tax returns, including local, state and federal, with respect to income, employees, excise and property. Manager may employ accountants or other professional consultants to the extent necessary to properly handle all tax matters, provided they get the prior written approval of the Board.

14.    Meetings with the Company. Representatives of Manager shall meet with the Board on a quarterly basis, upon reasonable notice, to discuss the progress and operations of the Center.

**SECTION 6.09.**    Limitations on Authority of Manager. Unless otherwise provided herein, the Manager shall not have the authority to do the following acts, without an approval by majority vote of the Board:

1.    Sell, exchange or otherwise transfer all or substantially all of the Company property, including the Center.

2.    Dissolve, merge, consolidate, sell or otherwise modify the Company or any subsidiary of the Company.

3.    Change the name of the Company's business.

4.    Make any amendment to the provisions of this Agreement, except as provided in Article XIV.

5.    File a voluntary bankruptcy petition for the Company.

6.    Admit new Members.

7.    Offer additional units of the Company.

8.    Any other matters with respect to which exclusive authority is granted to the Members of the Company by the Act, the Articles of Organization of the Company, or this Agreement.

## ARTICLE VII

## TERMINATION OF MANAGER

**SECTION 7.01.**    Termination for Cause. The Members shall have the right to remove

16

578540.4/SPH/16198/0101/051707

the Manager for cause upon the vote of seventy percent (70%) of the Units in accordance with this Section only.

1.      The Manager may be removed for a material breach of its obligations under this Section 7.01 only if such breach continues unabated after sixty (60) days notice from the Board; provided, however, that if the breach is of a kind that cannot be cured within such sixty (60) day period, the Manager shall not be removed if it has initiated and diligently pursued a cure throughout the period. Any termination or removal of the Manager for any reason other than those listed in this Section 7.01 shall be termination without cause. The following acts or omissions of the Manager constitute a material breach:

a.      institution by the Manager of voluntary bankruptcy proceedings or the filing of an involuntary petition of bankruptcy which petition is not dismissed within sixty (60) days;

b.      insolvency;

c.      cessation to do business;

d.      failure to establish the Center as an operating business within eighteen (18) months from the date of this Operating Agreement due to an act or omission of the Manager;

e.      failure to operate its business and the Center in substantial compliance with all applicable laws and regulations;

f.      failure to maintain all licenses, permits and franchises necessary to conduct its business on behalf of the Company;

g.      attachment of a valid lien or other encumbrance which endangers the assets of the Company unless reasonably disputed or contested by the Manager.

**SECTION 7.02.**      Termination Without Cause. The Members shall have the right to remove the Manager without cause upon the vote of seventy percent (70%) of the outstanding Units in accordance with this Section only.

a.      After a period of one (1) year from the date the Center opens and upon ninety (90) days prior written notice to the Manager.

b.      After a period of one (1) year from the date the Center opens and upon ninety (90) days prior written notice to the Company, the Manager shall have the right to resign as Manager.

c.      If Manager is removed without cause pursuant to this Section the Company shall pay the Manager a termination payment which shall be the greater of:

1.      An amount equal to the gross projected Management Fee for a period of four (4) years after the first full year of operation which Manager would earn according to the

17

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 18 of 37

physician ProFormas which are attached as Exhibit C.

2.       An amount equal to four (4) times the gross Management Fee for the twelve months immediately preceding the termination date.

**SECTION 7.03.**       Redemption Upon Removal.  Upon removal of the Manager, the Managers Units shall, at the option of either the Manager or the Company, be redeemed by the Company for the Appraised Value of the Units.  The Appraised Value of the Units shall be paid, at the option of the Company, in either a lump sum payment or in thirty six monthly installments with interest of the prime rate plus one percent (1%).

ARTICLE VIII

RIGHTS AND OBLIGATIONS OF THE MEMBERS

**SECTION 8.01.**  Board of Executive Members.

1.       The Members shall, by Majority Vote of the Members, elect a Board of Executive Members, consisting of five representatives.  PVS shall appoint one of the Board Members and St. Michael's Center for Special Surgery – Phoenix, LLC shall appoint the other four (4) members. Subject to any provisions of this Agreement to the contrary, such Board of Executive Members shall set policy guidelines for operation of the Center.  The Manager shall have the exclusive authority to manage the day-to-day operations of the Center, however, the Board shall advise and counsel the Manager regarding all long term planning, policies and procedures of the Center and other related matters.

2.       Each member of the Board shall serve until a successor shall have been elected and qualified; provided, however, any member of the Board may be removed at any time without prior notice and with or without cause by a Majority Vote of the Members.

3.       A meeting of the Board may be called from time to time by any Member thereof with or without prior written notice.  Meetings of the Board shall be held at the Company's principal offices set forth in Section 1.03 or such other place as may be approved by a majority of the Board. Any action that may be taken at a meeting of the Board may be taken without a meeting if a majority of the Members of the Board consents thereto in writing, which writings shall be filed in the records of the Company.  Any Member of the Board may participate in a meeting by any means of communication by which all Members participating may communicate with each other, simultaneously.  Any Member participating in a meeting by such method shall be considered present in person at the meeting.

**SECTION 8.02.**       Limitation of Liability.  Notwithstanding anything herein to the contrary except as otherwise expressly agreed in writing, a Member shall not be personally liable for any debts, liabilities, or obligations of the Company, whether to the Company, to any of the other Members, or to creditors of the Company, beyond the Capital Account of the Member, together with the Member's share of the assets and undistributed profits of the Company.

18

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 19 of 37

**SECTION 8.03.** Rights of Member Relating to the Company. In addition to other rights as provided by this Agreement or by the Act or other applicable law, a Member shall have the right upon demand and at such Member's own expense:

1. To obtain any and all information regarding the status of the business and financial condition of the Company;

2. To obtain a copy of the Company's federal, state, and local income tax returns for each year promptly after their preparation.

3. To have furnished to it a current list of the name and last known business, residence or mailing address of each Member;

4. To obtain information regarding the Capital Contributions made by each Member;

5. To receive a copy of this Agreement and the Articles of Organization and all amendments together with copies of any powers of attorney pursuant to which this Agreement, the Articles of Organization, and all amendments have been executed; and

6. To inspect and copy any of the Company's books and records and obtain such other information regarding the affairs of the Company.

**SECTION 8.04.** Member Covenants.

1. Confidential Information. Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section 8.04, the Member shall:

  a. treat the Confidential Information as secret and confidential;

  b. not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third party except with the prior written consent of Company;

  c. not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement; and

  d. limit the dissemination of and access to the Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section 8.04.

19

878540.4/SPH/16198/0101/051707

2.   Non-Competition.

a.   Each Member agrees that for so long as it owns Units and for a period of one (1) year thereafter, within 15 miles of the Center, it shall not, directly or indirectly, alone or as a member of a partnership, or as an officer, director, shareholder, member, medical director, principal, agent or employee of any corporation, limited liability company, partnership, or any other entity or Person, engage in the ownership, operation, management or control (or be employed by, alone or in connection with any other Person) of any Medicare certified outpatient surgical center or outpatient surgery provider that specializes in the treatment of hand or upper extremity procedures.

b.   If a court of competent jurisdiction should declare this Section 8.04, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

c.   Each Member specifically acknowledges that a breach of this Section 8.04 would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Physician Member of any of the provisions of this Section 8.04, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorney's fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

d.   The provisions of this Agreement shall not be construed to prohibit Manager, from owning, developing or managing similar facilities.

3.   Additional Covenants. Each Member warrants and represents that he, she or it:

a.   is familiar with the confidentiality agreement and non-competition agreements contained herein;

b.   has concluded that its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable;

c.   is fully aware of the duties, responsibilities, obligations, and liabilities imposed by this Section 8.04;

d.   acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty;

e.   acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no

20

578540.4/SPH/16198/0101/051707

obligation or current intention to register such Units under the Securities Act of 1933, as amended ("Securities Act");

       f.     acknowledges that the Units have not been registered under the Securities Act because the Company is issuing such Units in reliance upon the exceptions from registration requirements of the Securities Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the State Securities Act and any corresponding regulations; and

       g.     acknowledges that the exemptions from registration under the Securities Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

       h.     acknowledges that (i) if a corporation or other entity, the Member is duly organized, validly existing and in good standing under the law of the state of its incorporation, (ii) if a corporation or other entity, it has full corporate or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all necessary actions by the Board of Directors, Shareholders, Managers, Members, partners or other persons necessary for the due authorization, execution, delivery and performance of this Agreement by that Member have been duly taken, (iii) it has duly executed and delivered this Agreement, and (iv) its authorization, execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party or by which it is bound.

    **SECTION 8.05.**    Restrictions on Powers. Except as otherwise provided herein or by the Mandatory Provisions of the Act, a Member shall not have the authority or power to act on behalf of, or to bind, the Company, or any other Member, and a Member shall not have the right or power to take any action which would change the Company to a general partnership, change the limited liability of a Member, change the manager or affect the status of the Company.

    **SECTION 8.06.**    Indemnification.

    1.    Company Indemnity. To the maximum extent permitted by law, the Company shall indemnify and hold harmless all Members, their respective Affiliates, and the Manager, employees and agents of the Company (each an "Indemnitee") from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including attorney's fees and disbursements), judgments, fines, settlements, penalties and other expenses actually and reasonably incurred by the Indemnitee in connection with any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Indemnitee may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that the Indemnitee is or was a Member of the Company, or is or was an employee or agent of the Company, including Affiliates of the foregoing, arising out of or incidental to the business of the Company, provided, (i) the Indemnitee's conduct did not constitute willful misconduct or recklessness, (ii) the action is not based on breach of this Agreement (iii) the Indemnitee acted in good faith and in a manner it reasonably believed to be in, or not opposed to the best interests of the Company and within the scope of such Indemnitee's authority, or (iv) with respect to a criminal action or

21

576540.4/SPH/16198/0101/051707

proceeding, the Indemnitee had no reasonable cause to believe its conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere, or its equivalent, shall not, in and of itself, create a presumption or otherwise constitute evidence that the Indemnitee acted in a manner contrary to that specified above.

2. Advancement of Expenses. Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to this Section may, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall ultimately be determined that such Person is not entitled to be indemnified as authorized in this Section.

3. Non-Exclusivity. The indemnification provided by this Section shall be in addition to any other rights to which the Indemnitee may be entitled under any agreement, vote of the Members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnitee.

4. Insurance. The Manager may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnitee against any liability that may be asserted against or expense that may be incurred by an Indemnitee in connection with the activities of the Company regardless of whether the Company would have the power to indemnify, such Indemnitee against such liability under the provisions of this Agreement.

**SECTION 8.07.** Personal or Corporate Guaranties. In the event a Member is required to pay and actually pays money to a creditor of the Company in liquidation of an enforceable debt of the Company, which payment was required under a guaranty in which all Members are guarantors, the amount of such payment shall be prorated among all Members in the same proportions as the number of Units held by each Member bears to all Outstanding Units, and the other Members shall pay their applicable prorated amounts to the Member who paid the creditor. A Member having a right to payments from the other Members under the preceding sentence shall have a right of contribution against the other Members for the amount in which he has such right to payment. The remedies set forth in this Section 8.07 are not exclusive and shall be available in addition to all other remedies under applicable law. When a Member is no longer a member of the Company, the former Member shall remain liable to the other Members for payments and contribution under this Section 8.07, only as to guaranties entered into when it was a Member of the Company, unless and until a written discharge of such liability is executed by the Company authorized by a Majority Vote of the Members.

**SECTION 8.08.** No Liability. Each party acknowledges that they have entered into this Agreement voluntarily and of their own accord. The Members agree and acknowledge that upon redemption of their interest pursuant to the terms set forth in this Agreement that the remaining Members and Manager shall have no liability to the redeemed Member arising out of or in connection with the redemption of their Units.

22

**SECTION 8.09**     Redemption of Manager's Units. At any time from November ____, 2009 on, the Company shall have the right to redeem the Manager's Units at a purchase price of the Appraised Value. The Company may pay the purchase price via a note payable over three (3) years with interest payable at the prime rate plus one percent (1%).

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING, AND REPORTS

**SECTION 9.01.**     Books and Records. Appropriate books and records with respect to the Company's business shall at all times be kept at the principal office of the Company or at such other places as agreed to by the Members, including but not limited to: (i) a current list of the full name and last known business address of each Member, (ii) copies of records that would enable a Member to determine the relative voting rights of the Members, (iii) a copy of the Articles of Organization and this Agreement and any amendments thereto, (iv) copies of the Company's federal, state and local income tax returns and reports, if any, for the three most recent years; and (v) copies of any financial statements of the Company for the three most recent fiscal years. Any records maintained by the Company in the regular course of its business may be kept on, or be in the form of, magnetic tape, photographs or any other information storage device, provided that the records so kept are convertible into clearly legible written form within a reasonable period of time.

**SECTION 9.02.**     Accounting. The books of the Company shall be maintained on the accrual basis of accounting in accordance with the provisions of this Agreement Section 704 of the Code and, to the extent not inconsistent therewith generally accepted accounting principles for accrual basis accounting.

**SECTION 9.03.**     Fiscal Year. The fiscal year of the Company shall be the calendar year, unless otherwise determined by Majority Vote of the Members.

## ARTICLE X

## TAX MATTERS

**SECTION 10.01.**     Taxable Year. The taxable year of the Company shall be the calendar year, unless otherwise determined by Majority Vote of the Members.

**SECTION 10.02.**     Tax Controversies. Subject to the provisions hereof, the Manager is designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Company, at the Company's expense, in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings. Each Member agrees to cooperate with the Tax Matters Partner, and to do or refrain from doing any or all things reasonably required by the Tax Matters Partner to conduct such proceedings.

**SECTION 10.03.**     Taxation as a Partnership. The Company has determined that it shall be taxed as a partnership. No election shall be made by the Company or any Member for the

23

Case 2:09-ap-01360-RTB     Doc 1-1     Filed 10/19/09     Entered 10/19/09 16:48:34     Desc
Exhibit A     Page 24 of 37

Company to be excluded from the application of any provision of Subchapter K, Chapter I of Subtitle A of the Code or from any similar provisions of any state tax laws.

**SECTION 10.04.**    Tax Elections. The Company shall make the following elections on the appropriate tax returns:

1.    to adopt the year ending December 31 as the Company's fiscal year;

2.    to adopt the accrual method of accounting and to keep the Company's books and records on the income tax method;

3.    to elect, pursuant to Section 754 of the Code, to adjust the basis of Company Property if a distribution of Company property as described in Section 734 of the Code occurs or if a transfer of a Unit as described in Section 743 of the Code occurs, on written request of any Member,

4.    to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company under Section 195 of the Code ratably over a period of 60 months as permitted by Section 709(b) of the Code; and

5.    to make any other election the Manager may deem appropriate and in the best interests of the Members.

Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement (including, without limitation, Section 2.6) shall be construed to sanction or approve such an election.

## ARTICLE XI

## TRANSFER OF UNITS

**SECTION 11.01.**    Restrictions on Transfer. A Member shall not sell, hypothecate, pledge, assign or otherwise transfer with or without consideration (hereinafter collectively referred to as a "Transfer") its interest in the Company, in whole or in part, except as allowed by this Article XI. This restriction on transfer shall not prohibit a Member from assigning some or all of his share of distributions; provided, however, that such assignment shall not entitle the Assignee to any of the other rights of the assigning Member until and unless the Assignee is admitted as a Substitute Member of the Company under Article XII.

**SECTION 11.02.**    Purchase Option. Except as otherwise provided in Section 11.03 hereof, no Member (hereinafter referred to as the "Offering Member") shall, during the term of the Agreement, Transfer any part or all of its Units of the Company to any other person (a "Transferee"), without first offering (hereinafter referred to as the "Offer") that portion of his Units of the Company subject to the contemplated Transfer (hereinafter referred to as the "Offered Interest") first to the Company, and secondly, to the other Members, at a purchase price (hereinafter referred to as the

24

578540.4/BPH/16198/0101/051707

"Transfer Purchase Price") and in a manner as follows:

1.     The Transfer Purchase Price shall be the offered purchase price or the Appraised Value (as defined in Section 11.05) whichever is less.

a.     The Offer shall be made by the Offering Member first to the Company by written notice (hereinafter referred to as the "Offering Notice").

b.     Within twenty (20) days (hereinafter referred to as the "Company Offer Period") after receipt by the Company of the Offering Notice, the Company shall notify the Offering Member in writing (hereinafter referred to as the "Company Notice"), whether or not the Company shall accept the Offer and shall purchase all but not less than all of the Offered Interest.

c.     If the Company accepts the offer to purchase the Offered Interest, the Company Notice shall fix a closing date not more than twenty-five (25) days (hereinafter referred to as the "Company Closing Date") after the expiration of the Company Offer Period.

2.     If the Company decides not to accept the Offer, the Offering Member or the Company, at his or its election, shall, by written notice (hereinafter referred to as the "Remaining Member Notice") given within that period (hereinafter referred to as the "Member Offer Period") terminating ten (10) days after the expiration of the Company Offer Period, make the Offer of the Offered Interest to the other Members, each of whom shall then have a period of twenty-five (25) days (the "Member Acceptance Period") after the expiration of the Member Offer Period within which to notify in writing the Offering Member whether or not he intends to purchase all but not less than all of the Offered Interest. If two (2) or more Members of the Company desire to accept the Offer to purchase the Offered Interest, then, in the absence of an agreement between them, such Members shall have the right to purchase the Offered Interest in proportion which their respective percentage of Units owned in the Company bears to the percentage of Units owned in the Company of all of the Members who desire to accept the Offer. If the other Members intend to accept the Offer and to purchase the Offered Interest, the written notice required to be given by them shall fix a closing date not more than ten (10) days after the expiration of the Member Acceptance Period (hereinafter referred to as the "Member Closing Date"). To the extent the Members do not buy all of the selling Member's Interests, the Company will buy the remaining Interests.

3.     The dollar amount of the Transfer Purchase Price shall be payable in cash on the Company Closing Date or on the Member Closing Date, as the case may be, unless the Company or the purchasing Members shall elect prior to or on the Company Closing Date or the Member Closing Date, as the case may be, to purchase such Offered Interest in installments pursuant to the provisions of Section 11.06 hereof.

4.     If the Company or the other Members fail to accept the Offer or, if the Offer is accepted by the Company or the other Members and the Company or the other Members fail to purchase all of the Offered Interest at the Transfer Purchase Price within the time and in the manner specified in this Section 11.02, then the Offering Member shall be free, for a period (hereinafter referred to as the "Free Transfer Period") of sixty (60) days from the occurrence of such failure, to

25

578540.4/8PH/16198/0101/051707

transfer the Offered Interest to a Transferee; subject only to any additional restrictions on such Transfer that may be imposed by this Agreement or any other applicable written agreement. Any such Transferee, upon acquiring the Offered Interest, shall automatically be bound by the terms of this Agreement and shall be required to join in, execute and deliver a copy of this Agreement as a result of which he shall become an additional party hereto. If the Offering Member shall not transfer the Offered Interest within the Free Transfer Period, his right to transfer the Offered Interest free of the foregoing restrictions shall thereupon cease and terminate.

     5.    No transfer made pursuant to this Section 11.02 shall dissolve or terminate the Company or cause the Company to be wound up, but instead, the business of the Company shall be continued as if such transfer had not occurred.

     **SECTION 11.03.**    Additional Withdrawal Events Giving Right to Purchase Option.

     1.    If any Member:

         a.    shall have filed against him, her, or it any tax lien respecting all or substantially all of his, her or its property and such tax lien shall not be discharged, removed or bonded within sixty (60) days of the date on which it was filed;

         b.    shall become insolvent or shall be unable to pay his, her or its debts as they mature or makes a general assignment for the benefit of creditors;

         c.    shall be finally adjudicated a bankrupt or shall voluntarily file a petition in bankruptcy seeking a reorganization or to affect a plan or other arrangement with creditors;

         d.    shall file an answer to a creditor's petition or other petition filed against it admitting the material obligations thereof for an adjudication in bankruptcy or reorganization; or

         e.    shall subject his, her or its Units to a charging order entered by any court of competent jurisdiction.

Such Member shall be a "Defaulting Member". Such vote must be taken within ten (10) days of the request of any Member; thereafter, immediately upon the occurrence of such events (the "Occurrence Date"); the Company shall have the right and option, exercisable by written notice to the Defaulting Member, within thirty (30) days of the Occurrence Date, to purchase from the Defaulting Member, who shall sell to the Company, all of the Units of the Company (the "Defaulting Member's Interest") owned by the Defaulting Member in the Company on the Occurrence Date ("Default Closing Date"). The Company shall, by, written notice delivered to the Defaulting Member or his successors, fix a closing date for such purchase which shall be not less than forty (40) days after the Occurrence Date, but in no event longer than seventy-five (75) days after the Occurrence Date. The Defaulting Member's Interest shall be purchased by the Company on such closing date at a price (the "Defaulting Member's Purchase Price") which shall be one half (1/2) of the Appraised Value.

     3.    The dollar amount of the Defaulting Member's Purchase Price shall be payable in cash

26

on the Default Closing Date, unless the Company shall elect prior to or on the Default Closing Date to purchase the Defaulting Members' interest in installments as provided in Section 11.07 of this Agreement.

4. Disability of a Member, as defined by a majority of the Members from time to time, shall also be dealt with under this Section 11.03.

**SECTION 11.04.** Certain Tax Aspects Incident to Transactions Contemplated by this Agreement. It is the intention of the parties that the Transfer Purchase Price, the Decedent Purchase Price, the Withdrawing Purchase Price and the Defaulting Member's Purchase Price shall constitute and be considered as made in exchange for the interest of the terminated Member in Company Property, including goodwill, within the meaning of Section 736(b) of the Code.

**SECTION 11.05.** The Appraised Value. The term "Appraised Value," as used in this Agreement, shall be the dollar amount equal to the product obtained by multiplying (a) the percentage of Units of the Company owned by a Member by (b) the Fair Market Value of the Company's assets, as determined in accordance with Section 11.05(1).

1. The Fair Market Value of the Company's assets shall be determined in the following manner:

a. Within thirty (30) days of the date of the Offering Notice, date of death of a Decedent, the Withdrawal Date or the Occurrence Date, as the case may be, the remaining Members shall select an appraiser (the "Company Appraiser") to determine the Fair Market Value of the Company's assets, and the Company Appraiser shall submit his determination thereof within thirty (30) days after the date of his selection (the "Appraisal Due Date").

b. If the appraisal made by the Company Appraiser is unsatisfactory to the Offering Member, the personal representatives or heirs of the Decedent, the Withdrawing Member or the Defaulting Member, as the case may be, then within fifteen (15) days after the date of the Appraisal Due Date, the Offering Member, the personal representatives or heirs of the Decedent, the Withdrawing Member or the Defaulting Member, as the case may be, shall select an appraiser (the "Member's Appraiser") to determine the Fair Market Value of the Company's assets, and such appraiser shall submit his determination thereof within thirty (30) days after the date of his, her or its selection.

c. If the appraisal made by the Member's Appraiser is unsatisfactory to the remaining Members, then the Company Appraiser and the Member's Appraiser shall select a third appraiser (the "Appraiser") to determine the Fair Market Value of the Company's assets and such Appraiser shall submit his determination thereof within thirty (30) days after the date of his, her or its selection. The Appraiser's determination thereof shall be binding upon the Company, the remaining Members and the Offering Member, the personal representatives or heirs of the Decedent, the Withdrawing Member or the Defaulting Member, as the case may be.

2. Any and all appraisers selected in accordance with the provisions of this Section 11.05

27

578540.4/SFH/16198/0101/051707

shall be local area appraisers, who shall conduct appraisals provided for in this Section 11.05 in accordance with generally accepted appraisal standards. Any and all costs incurred in connection with any of the appraisals provided for in this Section 11.05 shall be borne equally by the remaining Members, and the Offering Member, the personal representatives of the Decedent or heirs, the Withdrawing Member or the Defaulting Member, as the case may be.

## SECTION 11.06.    Installment Payments.

1.    If there shall be an election pursuant to the provisions of section 11.02.3, hereof to purchase (the Member or the Company so purchasing shall be hereinafter, where appropriate, referred to as the "Purchasing Person") the Offering Member's Interest, the Decedent's Interest, the Withdrawing Member's Interest or the Defaulting Member's Interest, as the case may be (hereinafter where appropriate, referred to as the "Interest"), on an installment basis, then the terms and conditions of such installment purchase shall be as follows:

a.    Ten percent (10%) of the purchase price due for such Interest (hereinafter, where appropriate, referred to as the "Purchase Price") shall be paid on the closing date; and

b.    The remainder of the Purchase Price shall be paid in thirty-six (36) equal monthly installments (hereinafter referred to as the "Installment Payment Period") as evidenced by a negotiable promissory note which shall be signed by the Purchaser..

c.    The Purchasing Person shall pay simple interest fixed at the time of purchase at a rate equal to the Prime Rate plus one percentage point interest on the unpaid balance of the Purchase Price on each anniversary of the closing date during the Installment Payment Period.

2.    So long as any part of the Purchase Price remains unpaid, the Members shall permit the Offering Member, the personal representatives or heirs of the Decedent, the Withdrawing Member (or the legal representative of the Withdrawing Member in the event of the bankruptcy of the Withdrawing Member) or the Defaulting Member, as the case may be, and the attorneys and accountants of each of the foregoing Persons, to examine the books and records of the Company and its business following the event that shall have given rise to the election referred to in Section 11.06.1 hereof during regular business hours from time to time upon reasonable prior notice and to receive copies of the annual accounting reports and tax returns of the Company.

## SECTION 11.07.    Delivery of Evidence of Interest. On the closing date, upon payment of the Purchase Price for the purchase of the Interest hereunder or, if payment is to be made in installments pursuant to the provisions of Section 11.06 hereof, upon the first payment, the Offering Member, the Withdrawing Member, the personal representative or heirs of the Decedent, the Withdrawing Member (or the legal representative of the Withdrawing Member in the event of the bankruptcy of the Withdrawing Member) or the Defaulting Member, as the case may be, shall execute and deliver to the Purchasing Person such instrument or instruments of transfer to evidence the purchase of the Interest (the "Instrument of Transfer") that shall be reasonably requested by counsel to the Purchasing Person in form and substance reasonably satisfactory to such person. If a tender of the Purchase Price or, if payment is to be made in installments pursuant to the provisions of

28

578540.4/8PH/16198/0101/051707

Section 11.06 hereof, the tender of the first payment thereof, shall be refused, or if the Instrument of Transfer shall not be delivered contemporaneously with the tender of the Purchase Price or of the first payment thereof, as aforesaid, then the Purchasing Person shall be appointed, and the Company is hereby irrevocably constituted and appointed, the attorney-in-fact with full power and authority to execute and deliver the Instrument of Transfer.

**SECTION 11.08.** Prohibited Transfers and Assignments. No transfer or assignment shall be made if the transfer or assignment (i) would violate applicable federal and state securities laws or regulations, (ii) would materially adversely affect the classification of the Company as a partnership for federal or state income tax purposes, or (iii) would affect the Company's qualification as a limited liability company under the Act.

ARTICLE XII

ADMISSION OF SUBSTITUTE AND ADDITIONAL MEMBERS

**SECTION 12.01.** Admission of Substitute Members.

1.     Upon a Transfer of a Unit by a Member in accordance with Article XI, the transferor shall have the power to give, and by any assignment of Units or transfer of any certificate issued shall be deemed to have given, the transferee the right to apply to become a Substitute Member with respect to the Unit acquired, subject to the conditions of and in the manner permitted under this Agreement. A transferee of a certificate or an assignee of any Unit shall not be a Member or Substitute Member with respect to the transferred Unit (whether or not such transferee is a Member or Substitute Member with respect to other previously acquired Units) unless and until all of the following conditions are satisfied:

a.     The instrument of assignment sets forth the intentions of the assignor that the Assignee succeed to the assignor's interest as a Substitute Member in his place;

b.     The Assignee shall have paid all reasonable legal fees and filing costs incurred by the Company in connection with his substitution as a Member;

c.     The Members shall have approved such substitution in writing by a majority vote of the Members, which approval may be granted or withheld by each Member in its sole and absolute discretion;

d.     The Assignee agrees to be bound by the terms of the Operating Agreement.;

e.     The Assignor and Assignee shall have fulfilled all other requirements of this Agreement; and

f.     The books and record of the Company have been modified to reflect the admission.

29

578540.4/SPH/16198/0101/051707

2.    The admission of an Assignee as a Substitute Member with respect to a transferred Unit shall become effective on the date the Members give their written consent (following the required approval of 75% of the outstanding Units) to the admission and the books and records of the Company have been modified to reflect such admission. Any Member who transfers all of his Units shall cease to be a Member of the Company only when the transferee or assignee is admitted as a Substitute Member. Until that time, the transferring Member shall continue to have all rights and obligations of a Member, except those rights to distributions which were transferred or assigned.

**SECTION 12.02.**    _Admission of Additional Members._    Additional Units may be authorized and issued by the Company upon such terms and conditions as may be approved by a majority vote of the Members. Upon the proposed issuance of any such additional Units, each existing Member shall have the preemptive right, but not the obligation, to purchase such portion of the newly issued Units as the ratio of the number of Units then held by such Member bears to the total number of Units held by Members and outstanding, before the Issuance of the new Units, together with such Member's proportionate share of the other newly issued Units as to which other Members fail to exercise their preemptive rights.

## ARTICLE XIII

## DISSOLUTION AND LIQUIDATION

**SECTION 13.01.**    _Dissolution and Liquidation._    The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following: (i) the term of the Company stated in the Articles of Organization expires; (ii) An affirmative vote of the Manager and Members holding a majority of the Outstanding Units to dissolve the Company; (iii) entry of a decree of judicial dissolution of the Company.

**SECTION 13.02.**    _Method of Winding Up._    Upon dissolution of the Company pursuant to Section 13.01, the Company shall immediately commence to liquidate and wind up its affairs. The Members and Assignees shall continue to share profits and losses during the period of liquidation and winding up in the same proportion as before commencement of winding up and dissolution. The proceeds from the liquidation and winding up shall be applied in the following order of priority:

1.    To creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of liabilities of the Company other than liabilities to Members on account of their Capital Contributions or on account of a Member's withdrawal from the Company or pursuant to withdrawal of capital; and

2.    The balance, to Members and Assignees in accordance with their Capital Accounts and pursuant to Section 5.01. Unless the Members shall unanimously determine otherwise, all distributions except as required herein shall be made in cash, and none of the Company Property will be distributed in kind to the Members.

**SECTION 13.03.**    _Filing Articles of Dissolution._    Upon the completion of the distribution of Company Property as provided in Section 13.03, Articles of Dissolution shall be filed as required

30

578540.4/SPH/16198/0101/051707

by the Act, and each Member agrees to take whatever action may be advisable or proper to carry out the provisions of this Section.

**SECTION 13.04.** Return of Capital. The return of Capital Contributions shall be made solely from Company Property.

ARTICLE XIV

AMENDMENT OF REGULATIONS; MEETINGS; RECORD DATE

**SECTION 14.01.** Amendments. All Amendments to this Agreement shall require affirmative vote of the Manager and Members holding seventy-five percent (75%) of the Outstanding Units.

**SECTION 14.02.** Limitations on Amendments. Notwithstanding any other provision of this Agreement, no amendment to this Agreement may (i) enlarge the obligations of any Member under this Agreement, or (ii) amend this Section 14.02, Section 14.01, or Sections 6.01, 6.02, 6.03, 6.04, 6.05, 6.06, 7.01, 7.02, 7.03 or 13.01 without the unanimous approval of all Members.

**SECTION 14.03.** Meetings. Meetings may be called by any Member by giving at least ten (10) days prior notice of the time, place and purpose of the meeting to all Members.

**SECTION 14.04.** Adjournment. When a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting, if the time and place thereof are announced at the meeting at which the adjournment is taken, unless such adjournment shall be for more than forty-five days. At the adjourned meeting, the Company may transact any business which might have been transacted at the original meeting. If the adjournment is for more than forty-five days, a notice of the adjourned meeting shall be given in accordance with Section 14.03.

**SECTION 14.05.** Waiver of Notice; Consent to Meeting; Approval of Minutes. The transactions of any meeting of the Company, however called and noticed, and whenever held, are as valid as though had at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the Members entitled to vote, but not present in person or by proxy, approves by signing a written waiver of notice or an approval to the holding of the meeting or an approval of the minutes thereof. All waivers, consents, and approvals shall be filed with the Company records or made a part of the minutes of the meeting. Attendance of a Member at a meeting shall constitute a waiver of notice of the meeting, except when such Member objects, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened; and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the notice of the meeting, but not so included, if the objection is expressly made at the meetings.

**SECTION 14.06.** Quorum. The holders of more than fifty percent (50%) of the Units entitled to vote represented in person or by proxy, shall constitute a quorum at any meeting requiring a majority vote of the Members. The holders of more than seventy five percent (75%) of the Units

31

578540.4/SPH/16198/0101/051707

entitled to vote represented in person or by proxy, shall constitute a quorum at any meeting requiring a seventy five percent (75%) vote of the Members. The Members present at a duly called or held meeting at which a quorum is present may continue to participate at such meeting until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by the requisite percentage of Units of Members specified in this Agreement. In the absence of a quorum, any meeting of Members may be adjourned from time to time by a Majority Vote of the Members represented either in person or by proxy entitled to vote, but no other matters may be proposed, approved or disapproved, except as provided in Section 14.04.

SECTION 14.07.    Action Without a Meeting. Any action that may be taken by any vote of the Members may be taken without a meeting if a consent to such action is signed by Members holding Units representing not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Prompt notice of the taking of any action without a meeting shall be given to those Members who have not consented in writing. Any Member may participate in a meeting by any means of communication by which all Members participating may communicate with each other simultaneously. Any Member participating in a meeting by such method shall be considered present in person at the meeting.

ARTICLE XV

GENERAL PROVISIONS

SECTION 15.01.    Notices. Any notice, demand, request or report required or permitted to be given or made to a Member under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class mail on the third (3rd) day thereafter to the Member at the address set forth on Schedule A . Any notice, payment or report to be given or sent to a Member hereunder shall be deemed conclusively to have been given or sent, upon mailing of such notice, payment, or report to the address shown on the records of the Company, regardless of any claim of any Person who may have an interest in the Unit by reason of an assignment or otherwise.

SECTION 15.02.    Captions. All article and section captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

SECTION 15.03.    Pronouns and Plurals. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

SECTION 15.04.    Further Assurances. The parties to this Agreement shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

32

578540.4/GPH/16198/0101/051707

**SECTION 15.05.** <u>Binding Effect</u>. This Agreement shall be binding, upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives and permitted assignees.

**SECTION 15.06.** <u>Integration</u>. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**SECTION 15.07.** <u>Waiver</u>. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

**SECTION 15.08.** <u>Counterparts</u>. This Agreement may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

**SECTION 15.09.** <u>Applicable Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its principles of conflict of laws.

**SECTION 15.10.** <u>Invalidity of Provisions</u>. If any provision of this Agreement are or becomes invalid, illegal, or unenforceable in any respect the validity, legality, and enforceability of the remaining provisions contained herein shall not be affected thereby.

[SIGNATURE PAGE FOLLOWS]

33

Case 2:09-ap-01360-RTB    Doc 1-1    Filed 10/19/09    Entered 10/19/09 16:48:34    Desc
Exhibit A    Page 34 of 37

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of _MAY 21_, 2007.

MEMBERS:

Provision Surgical, LLC

By: _____
Name: _JOE H. HUFFMYER_
Title: _MEMBER_

St. Michael's Center for Special Surgery – Phoenix, LLC

By: _____
Name: _Michael G. Brown_
Title: _Member / Manager_

MANAGER:

Provision Surgical, LLC

By: _____
Name: _JOE H. HUFFMYER_
Title: _MANAGER_

578540.4/SPH/16198/0101/051707

## SCHEDULE A

| Name and Address of Member | Capital Contribution | Number of Units | Percentage of Units |
|---|---|---|---|
| St. Michael's Center for Special Surgery, Phoenix, L.L.C. | $80.00. | 80 | 80% |
| Provision Surgical, L.L.C. | $20.00 | 20 | 20% |

35

**SURGEON'S MANAGEMENT, INC.**
P-B ACCOUNT
P.O. BOX 924357
HOUSTON, TX 77292
(281) 580-0554

1149

OMNIBANK, N.A.
HOUSTON, TEXAS 77221
35-103-1130

Jul 19, 2007

PAY TO THE
ORDER OF St Michael's Center for Special Surgery, Arizona, LLC

$ ****$200,000.00

Two Hundred Thousand and 00/100 Dollars

DOLLARS

St Michael's Center for Special Surgery, Arizona, LLC

MEMO Start-Up Working Capital Deposit

⑈001149⑈ ⑊113001035⑊ ⑈14000866001⑈

/00200000000/

sla 08-01-2007   Account 1400086801   Serial 1149   Amount 200000.00   Sequence 19340720   TR 118001035   TranCode 0

LEGACY BANK HENTON DK 111000038
111000038
08010007        08010007
EXT-0941 TRC-4941 FK-4   DR-1666 TRC-1407 FK-4   0019350720
1015134598 613740186 004  6  08/01/2007

DO NOT WRITE, STAMP OR SIGN BELOW THIS LINE
RESERVED FOR FINANCIAL INSTITUTION USE